## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**JAMES CINA,**
**individually, and on behalf of**
**the Cemex, Inc. Savings Plan,**

      **Plaintiff,**

**v.**

**CEMEX, INC.,**

      **Defendant.**

_____/

## CLASS ACTION COMPLAINT

1.     This action seeks to protect the retirement savings of more than 9,000 Cemex, Inc. ("Defendant" or "Cemex") employees who are participants in the Cemex, Inc. Savings Plan ("the Plan").

2.     Plaintiff, James Cina ("Plaintiff") brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29 U.S.C. §1109(a) and to restore to the Plan all losses resulting from Cemex's breaches of fiduciary duty.

## JURISDICTION AND VENUE

3.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

4.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

**ERISA**

5.     The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan, Cemex is obligated to act for the exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.     "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries…Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This principal favors liberal construction of pleadings. *Fitzgerald v. Codex Corp*., 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996).

7.     While everyone who participates in a 401(k) plan pays fees to maintain their account, industry insiders report that over 70% of people do not believe they pay any fees. To help the public obtain a better grasp on fees they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often fees are hidden from plain view. In many cases, plan providers do not make the fee and expense disclosures that the Department of Labor requires.

8.      Such is the case here. The account statements that Cemex provides to its Plan participants do not disclose the fees paid to third party service providers by Plan participants. In addition, the Plan's Annual Form 5500 Department of Labor reports are supposed to identify the fees paid to third parties, but as discussed below, they do not.

9.      Cemex's fiduciary obligations with respect to the Plan are especially important because Plan participants cannot negotiate fees charged to Plan participants. Plan participants must trust that Cemex will prudently do so. Cemex is also responsible for selecting investments and hiring service providers for the plan. These fiduciary decisions have the potential to dramatically affect the amount of money that participants can save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1-2 (Aug. 2013).

10.     That is, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the retirement savings.

11.     Accordingly, Cemex must engage in a rigorous process to control fees and ensure that Plan participants pay no more than a reasonable level of fees. This is particularly true for billion-dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service and the lowest fees. The fees available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

12.     The entities that provide administrative services and investments to retirement plans have a strong incentive to maximize their fees. Each dollar in fees paid from participants'

retirement savings reduce by the same amount participants' retirement savings, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, monitor, and reduce a plan's fees.

13.     Plan fiduciaries must be cognizant that self-interested third parties seek to maximize fees from plans, and fiduciaries may not simply accede to demands, or agree to quotes without negotiating or considering alternatives. To act in the exclusive interest of a Plan and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake.

## THE PLAN

14.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

15.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

16.     Cemex is a statutory fiduciary to the Plan.

17.     Eligible current and former employees of Cemex are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former Cemex employees.

18.     Defined contribution retirement plans are generally classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (>$1 billion).

19.     As of December 31, 2021, the Plan had $877,803,260 in assets and 9,269 participants with account balances. Thus, the Plan qualifies as a "large" plan in the 401(k) marketplace.

20.     Instead of leveraging the Plan's tremendous bargaining power to benefit Plan

participants, Cemex caused the Plan to pay unreasonable and excessive fees.

## THE PARTIES

21.     Plaintiff James Cina is a former employee of Cemex and a current Plan participant. He worked for Cemex from 2005 through March of 2022.  During his employment, Mr. Cina worked as a driver, dispatcher, and, finally, as a manager.  He is still a participant in the Plan.

22.     Plaintiff has statutory standing to bring this action because 29 U.S. §1132(a)(1) allows a plan participant to file a civil action which seeks relief on behalf of a plan. Here, the Plan suffered millions of dollars in losses caused by Cemex's fiduciary breaches. Plaintiff alleges he and Plan participants suffered the same losses resulting from the ERISA violations committed by Cemex as set forth herein. All relief in this action sought by the Plaintiff is sought on behalf of the Plan.

23.     To establish Constitutional standing (or Article III standing), a Plaintiff need only show a concrete and particularized injury flowing from Cemex's ERISA fiduciary breaches. Plaintiff alleges his individual account in the Plan suffered losses because his account was assessed excessive fees, which would not have been incurred had Cemex discharged its ERISA fiduciary duties to the Plan and ensured fees were reasonable. That money (millions of dollars) should have gone towards Plan participants' retirement; instead, it went elsewhere. Accordingly, Plaintiff alleges concrete and particularized injuries. Plaintiff also has standing because he is seeking injunctive and equitable relief on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following proposed class ("Class"):

All persons who were participants in or beneficiaries of the Cemex Savings Plan, at any time between January 3, 2017, and the present (the "Class Period").

25.     The members of the Class are so numerous that joinder is impractical. According to the Plan's Annual Form 5500 for the year ending 2021, filed with the U.S. Department of Labor, there were 9,269 Plan participants with account balances as of December 31, 2021.

26.     Plaintiff's claims are typical of Class members' claims. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Cemex's ERISA fiduciary breaches. Cemex treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and Class members' claims arise out of the same conduct, policies, and practices of Cemex as alleged herein, and all members of the Class have been similarly affected by Cemex's ERISA violations.

27.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Cemex is a fiduciary of the Plan;

B.     Whether Cemex breached its fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether Cemex failed to prudently monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     Whether Cemex caused the Plan to pay excessive fees for administrative services;

E.     Whether Cemex caused the Plan to pay excessive fees for investments;

F.     The proper form of equitable and injunctive relief; and

G.     The proper measure of relief.

28.     Plaintiff will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no

interests antagonistic to those of other Class members. Plaintiff is committed to the vigorous prosecution of this action and anticipated no difficulty in the management of this action as a class action.

29.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Cemex. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

30.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because Cemex has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## EXCESSIVE ADMINISTRATIVE FEES

### *Background on Plan Administrative Fees*

31.     Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access

to investment education materials or investment advice. These administrative services are largely commodities, and the market for them is highly competitive.

32.     Nearly all recordkeepers in the marketplace offer the same range of services. Many of the recordkeeping services can be provided by recordkeepers at very little cost.

33.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, recordkeepers vigorously compete for business by offering the best price.

34.     The cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

35.     Recordkeeping expenses can be paid directly from plan assets, or indirectly by taking money from plan participants' individual accounts (or a combination of both).

36.     In a typical "direct" recordkeeping fee arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services – for example, $25.00 per year, per plan participant.

37.     A flat price based on the number of participants in the plan ensures that the amount of compensation is tied to actual services provided and does not grow based on matters that have nothing to do with actual services provided by a recordkeeper, such as an increase in plan assets due to market growth, or greater plan contributions by employees.

38.     By way of illustration, a plan with 16,000 participants and $2 billion in assets may issue a request for proposal to several recordkeepers and request that the recordkeepers provide pricing based on a flat rate for a 16,000-participant plan. If the winning recordkeeper offers to provide the recordkeeping services at a flat rate of $25.00 per participant, per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $400,000 direct annual fee (16,000 participants at $25.00 per participant). If the plan's assets double and increase to $4 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not double as the plan assets did.

39.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $25.00 fee from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per participant rate of $25.00 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.024% of his or her account balance annually for recordkeeping ($400,000/$2,000,000,000 = 0.0002). If plan assets increase thereafter, the percentage would be adjusted downward so that the plan is still paying the same $400,000 price that was negotiated at the plan level for services to be provided to the plan.

40.     Recordkeepers in the marketplace offer an array of other fee and expense models. These often include some combination of dollar-per-head and asset-based approaches. Plaintiff is not alleging that Cemex was required to use a direct payment arrangement – or any specific

payment arrangement for that matter. Rather, Plaintiff is simply providing details on how direct payment methods operate and provides these details to partially illustrate (together with all the allegations herein) that the recordkeeper fees the Plan participants are paying are excessive and that Cemex should have done more to investigate, monitor, request, negotiate, and secure reasonable fees for the Plan.

41.     The Plan's recordkeeper is Fidelity Investments Institutional ("Fidelity"). Fidelity receives direct and indirect fees from the Plan.

### *Defendant Caused the Plan to Pay Excessive Direct and Indirect Compensation*

42.     As demonstrated by Exhibit A, the Plan's annual fee disclosure, Fidelity receives direct compensation of at least $50.00 annually from Plan participants. A reasonable total fee for recordkeeping ought to be no more than $25.00 annually. Accordingly, Fidelity's direct fee alone is more than double what it ought to be. Not only that, an additional $24.00 in recordkeeping fees are paid as direct compensation to "Non-Fidelity Fees," making the total recordkeeping fees paid annually $74.00 per participant.  But it gets much worse.

43.     Fidelity also receives indirect fees. Fidelity receives indirect fees in two material ways. First, Fidelity receives fees via "float" on Plan participant money. Second, Fidelity receives fees via a practice known as revenue sharing.

44.      With regard to fees via float, Cemex agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan that the money will first pass through a Fidelity clearing account. Plan participant money typically sits in Fidelity's clearing account for 2-3 days. Cemex also agreed Fidelity could keep the investment returns and/or any interest earned on Plan participant money while the money is in Fidelity's clearing account. This is a form of indirect compensation that Fidelity receives as the recordkeeper for the Plan. The Plan's Annual

Form 5500s for the five years preceding 2021 shows that hundreds of millions of dollars were transferred in and out of the Plan every year. However, Cemex has not tracked, monitored, nor negotiated the amount of compensation Fidelity receives from the return it earns on Plan participant money while the money is in Fidelity's clearing account.  Discovery will prove Fidelity earned millions of dollars in float compensation alone. Cemex breached its fiduciary duty of prudence by allowing Fidelity to receive compensation from Plan participants without even knowing the amount of compensation Fidelity collects from interest on participant money as to the float, and because the amount of indirect compensation Fidelity receives via float is excessive relative to the services provided and relative to prudent options in the marketplace.

45. Fidelity also receives indirect compensation via revenue sharing. In a revenue-sharing arrangement, the amount of compensation for recordkeeping services to a plan is not based on the actual value of such services. Instead, compensation is based on the amount of assets in the plan, or the amount of assets in certain investments in the plan. For example, the recordkeeper will agree to a fee that is tethered to the amount of assets in a plan. The fees will grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, does not increase at a similar rate. By way of example, if a recordkeeper contracts to receive one percent annually of assets in the plan as indirect compensation for a plan with 100 participants and $250,000 in plan assets, the recordkeeper would receive $2,500 per year in fees, or $25.00 on a per plan participant basis. But if the plan assets increased to $250,000,000 – and the contract remains the same, the recordkeeper receives $2,500,000 per year in fees, or $25,000 per plan participant. This would be an excessive fee by any measure.

46. Revenue sharing, while not a *per se* violation of ERISA, can lead to massively excessive fees if not properly understood, monitored, and capped. If a fiduciary decides to use

revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other fee models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of fees.

47.    Self-interested recordkeepers prefer fee agreements that allow them to receive <u>direct</u> and <u>indirect</u> compensation for recordkeeping. Recordkeepers often tout the <u>direct</u> fees they collect as being "reasonable" while they surreptitiously pocket excessive fees from Plan participants via <u>indirect</u> fees. Such is the case here (although the direct compensation is also excessive).

48.    Recordkeepers often attempt to construct their fee agreements so that their fees are not solely tied to any actual services, but to the amount of assets in a plan (*i.e.*, float and revenue sharing). That way, as Plan assets increase, so do the recordkeeper's fees. Again, utilizing an approach that allows recordkeepers to collect fees indirectly is not *per se* imprudent. Plaintiff is not making a claim against Cemex merely because it allowed the Plan's recordkeeper to pocket direct and indirect fees. However, as is the case here, when indirect fees are left unchecked, they can be devastating for Plan participants. As one commentator noted, "[A]t worst, revenue sharing (one source of indirect fees) is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored

or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[1]

49.     Another commentator likened a revenue-sharing fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber based on the amount of water that flows through the pipe rather than the actual work provided. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

50.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid to the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

51.     Prudent fiduciaries implement three (at minimum) related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's compensation by demanding documents that summarize and contextualize the recordkeeper's

---

[1]     Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited December 28, 2022).

compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

52.     Second, prudent fiduciaries make an informed and reasoned evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee from a plan for the services provided to a plan, a prudent fiduciary must identify *all* compensation, including direct compensation and indirect compensation being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any excessive compensation received by a recordkeeper be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

53.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

54.     Based on information available thus far to Plaintiff, including client documents disclosed by the Plan, Cemex failed to conduct RFPs at reasonable intervals.

55.     Simply put, in this case, the fees Fidelity extracted from the Plan are excessive in relation to the specific services Fidelity provided to the Plan.

56.     The services offered by Fidelity are offered by all recordkeepers. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.  All national recordkeepers have the capability to provide recordkeeping services at very little cost to all large defined contribution plans

57.     Here, Cemex failed to prudently manage and control the Plan's recordkeeping costs and other compensation paid to Fidelity.

58.     Fidelity has been the Plan's recordkeeper during the entirety of the Class Period. In fact, Fidelity has been the Plan's recordkeeper since at least 2012.

59.     Based on information available thus far to Plaintiff, including client documents disclosed by the Plan, Cemex failed to obtain competitive bids ("RFP") during the Class Period which, in turn, has caused the Plan to overpay for recordkeeping during the entire Class Period.

60.     By going through an RFP process annually, or at least every three years, a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

61.     Besides failing to engage in the RFP process, Cemex's own documents fail to accurately disclose how much Fidelity is paid from the Plan in terms of either direct and/or indirect compensation.

62.     The amount of direct compensation Defendant caused the Plan to pay Fidelity is excessive regardless of how it is computed.  By way of specific example, attached as Exhibit A is a copy of the most recent Plan fee disclosure dated December 12, 2022. It states that Plan participants pay a total of $74.00 annually for recordkeeping and administrative services.  $50.00 of that $74.00 is allegedly for a "recordkeeping fee" paid to Fidelity, and $24.00 is for "Non-Fidelity Fee(s)."

63.     To be clear, even the $50.00 "recordkeeping fee" standing alone is excessive for this plan as to the services performed by Fidelity. When the $50.00 is added to the $24.00 "administrative fees," the $74.00 in direct compensation that Cemex caused the Plan to pay in recordkeeping fees becomes grossly excessive.

64.     However, during the Class Period, the direct compensation that Fidelity actually received from the Plan was indisputably far more than Defendant disclosed causing the Plan participants to pay Fidelity. For example, just based on the amounts disclosed by Defendant in the Plan's 5500 disclosures from 2016 to 2021, Fidelity received at least the following direct compensation from the Plan:

- $201,713 for the year 2016 during which there were 9,597 Plan participants with active account balances—equivalent to $21.01 per participant annually (not excessive, not part of Plaintiff' claim here);

- $234,898 for the year 2017 during which there were 8,787 Plan participants with active account balances—equivalent to $26.73 per participant annually (not excessive, not part of Plaintiff' claim here);

- $691,394 for the year 2018 during which there were 9,045 Plan participants with active account balances—equivalent to $76.43 per participant annually;

- $856,190 for the year 2019 during which there were 9,129 Plan participants with active account balances—equivalent to $93.78 per participant annually;

- $795,678 for the year 2020 during which there were 8,916 Plan participants with active account balances—equivalent to $57.88 per participant annually;

- $947,098 for the year 2021 during which there were 9,269 Plan participants with active account balances—equivalent to $57.97 per participant annually;

65.     Regardless of whether the true amount of direct compensation paid for recordkeeping to Fidelity is $50.00 (as reported in Defendant's fee disclosure), or is actually the higher amount listed above (as reported by Defendant in its mandatory Department of Labor disclosures), the "direct" compensation Cemex admits it caused the Plan to pay Fidelity during the class period was more than **double** what a reasonable fee should have been. But that's just the direct compensation. The bigger and more costly issue for the Plan and its participants is the indirect compensation not reported, and not readily disclosed.

66.     To be sure, during the Class Period the direct compensation that Fidelity received from the Plan was indisputably far more than Cemex disclosed causing the Plan participants to pay.

67.     As noted above, Fidelity did not receive only the direct compensation—it received even more compensation for recordkeeping services through indirect payments. However, those amounts are simply not disclosed to Plan participants, like Plaintiff.   Instead, Cemex's Annual Fee Disclosure uses the following double-speak to disclose the revenue sharing arrangement with Fidelity without disclosing the amount participants (much less the Plan) pay Fidelity:

**Asset-Based Fees**

Asset-based fees reflect an investment option's total annual operating expenses and include management and other fees. They are often the largest component of retirement plan costs and are paid by all shareholders of the investment option. Typically, asset-based fees are reflected as a percentage of assets invested in the option and often are referred to as an "expense ratio." You may multiply the expense ratio by your balance in the investment option to estimate the annual expenses associated with your holdings. Refer to Section 3 of this Notice for information about the Plan's investment options, including their expense ratios (where applicable).

Asset-based fees are deducted from an investment option's assets, thereby reducing its investment return. Fee levels can vary widely among investment options, depending in part on the type of investment option, its management (including whether it is active or passive), and the risks and complexities of the option's strategy. In some instances, a plan's administrative services may be paid for through offsets and/or payments associated with a plan's investment options.

68.     Cemex's Annual Form 5500 Reports (mandatory Department of Labor disclosures) do not disclose the amount of any indirect fees Fidelity collects, but do disclose that Fidelity receives such fees, as evidenced by the following screenshot:

FIDELITY INVESTMENTS INSTITUTIONAL

04-2647786

| (b)<br>Service Code(s) | (c)<br>Relationship to employer, employee organization, or person known to be a party-in-interest | (d)<br>Enter direct compensation paid by the plan. If none, enter -0-. | (e)<br>Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f)<br>Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g)<br>Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h)<br>Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 37 60 64 65 71 | RECORDKEEPER | 754043 | Yes ☒  No ☐ | Yes ☒  No ☐ | 0 | Yes ☒  No ☐ |

69.     Once again, while Cemex admits Fidelity is paid indirect compensation, at the same time Cemex discloses that amount as "0" and then claims that Fidelity provided it with a "formula instead of an amount or estimated amount."

70.     The indirect fees paid to Fidelity are far greater than recognized reasonable for a plan with more than $800 million in assets.

71.     Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to superior to the typical services that would have been provided to the Plan by Fidelity.

72.     As to the plan at issue here, Fidelity performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management, including computing, tabulating, and data processing.

73.     The fees described above were and remain excessive in relation to the services that the plan provided because, in fact, the services that Fidelity provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action.

74.     Cemex's failure to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

75.     Looking at recordkeeping costs for other plans of a similar size as of 2021 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.

76.     The chart below compares the Cemex 401(k) Plan to comparable plans with similar numbers of participants and assets under management for the year 2021 that also used Fidelity as a recordkeeper:

| Plan Name | Record-keeper | Total # participants w/ account balances | Dollar value of plan assets | Total reported recordkeeping and administrative service costs paid to Fidelity in 2021 | Record-keeping and admin-istrative service costs per-participant basis[2] | Service codes |
|---|---|---|---|---|---|---|
| Bertelsmann 401(k) Savings Plan (2021) | Fidelity | 12,678 | $1,841,040,164 | $60,104 | $4.74 | 37, 60, 64, 65 |
| Driv 401(k) Retirement Savings Plan (2021) | Fidelity | 10,170 | $935,056,886 | $89,447 | $8.79 | 37, 60, 64, 65, 71 |
| Mohawk Industries Retirement Plan 2 (2021) | Fidelity | 8,852 | $ 934,148,159 | $174,715 | $19.73 | 37, 64, 65, 71 |
| Veolia North America 401(k) Savings Plan (2021) | Fidelity | 8,030 | $962,454,316 | $187,620 | $23.36 | 37, 60, 64, 65, 71 |
| Cemex Corp. 401(k) Savings Plan (2021) | Fidelity | 9,269 | $877,803,260 | $947,098 | $57.97 | 37, 60, 64, 65, 71 |

77.     Importantly, the above benchmarking compares only fees paid to the above five plans' recordkeepers only as to direct compensation paid to similar plans' recordkeepers which, in all five of the examples, is Fidelity. Thus, Cemex caused its Plan to pay Fidelity excessive fees for the same services that Fidelity offered comparator plans for much less. These examples are illustrative and not exhaustive. Plaintiff anticipate expert witness reports will expand on the

---

[2] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2021) at pg. 29 (defining each service code), available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2021-instructions.pdf.

benchmarking herein and demonstrate conclusively that the Plan paid excessive and unreasonable fees.

78.     The Annual Form 5500 Reports from these various plans also demonstrate that, in fact, many of the recordkeeping services offered by Fidelity to the Plan here are/were similar to the above comparator plans. In fact, they are nearly identical, but done for $25 or less, per participant, annually.

79.     For example, the service codes from the 5500 for the Cemex 401(k) Plan from 2020 indicate that Fidelity performed the following discrete activities in 2020 for which it collected fees in the form of direct compensation: participant loan processing (service code "37"); sub-transfer agency (service code "60"); recordkeeping (service code "64"); account maintenance (service code "65"); and, finally, securities brokerage commission and fees (service code "71").  These services codes explain how, and why, Fidelity was paid for the recordkeeping and administrative services it performed for the Cemex Plan.  Those same service codes can also be used to compare plans.

80.     By way of comparison, according to the Form 5500s filed by the Driv 401(k) Retirement Savings Plan ("Driv Plan") and the Veolia North America 401(k) Savings Plan ("Veolia Plan") for the year 2021, Fidelity performed the exact same services for both the Driv Plan and the Veolia Plan that it performed for the Cemex Plan.

81.     All three plans, the Driv Plan, the Veolia Plan, and the Cemex Plan, use the exact same service codes when describing the services Fidelity performed for each plan, specifically: participant loan processing (service code "37"); sub-transfer agency (service code "60"); recordkeeping (service code "64"); account maintenance (service code "65"); and, finally, securities brokerage commission and fees (service code "71").  Each Plan is also of similar size in

terms of participants (less than 10,000 participants but more than 8,000 with account balances in 2021), and assets (less than $1 billion but more than $850 million).

82.     However, participants in the Driv Plan paid only $8.79 annually to Fidelity in direct compensation while participants in the Veolia Plan paid only $23.36 annually to Fidelity in direct compensation.

83.     On the other hand, Cemex Plan participants paid at least $50, not including the undisclosed indirect compensation Fidelity also received, for the same recordkeeping and administrative services the Driv Plan and Veolia Plan received for half the price.

84.     The same is true for the other comparator plans identified above, the Bertelsmann 401(k) Savings Plan ("Bertelsmann Plan") and the Mohawk Industries Retirement Plan 2.

85.     Beginning with the Bertelsmann Plan, the service codes from the Bertelsmann Plan's Annual 5500 Report indicate that its recordkeeper, Fidelity—again the same recordkeeper used by Cemex—performed basically the same work for both the Bertelsmann Plan and the Cemex Plan. This is demonstrated by the use of the 5500-service codes 37, 60, 64, and 65 when describing the kind of services provided and the type of compensation received by Fidelity for both the Bertelsmann Plan and Cemex Plan.  The only real substantive difference is that Fidelity performed the same work for the Bertelsmann Plan for just $4.74 per participant annually, whereas the Defendant caused the Cemex Plan to pay Fidelity at least $50 per participant annually in direct compensation.

86.     Much of the same is true for the last comparator plan, Mohawk Industries Retirement Plan 2.  Once again, just like Cemex, the Mohawk Plan used Fidelity as its recordkeeper.  The plans are of similar size in terms of assets and participants. Not only that, a comparison of the services codes, as applied to the work and services for which Fidelity was paid

for both plans, reveals that, in fact, Fidelity basically did the same work for both plans. Both share service codes 37, 64, 65, and 71.

87.     However, Defendant caused the Cemex Plan's participants to pay more than twice as the Mohawk Plan participants paid for the same work performed by the same recordkeeper for the same-sized plan. This is demonstrated by the fact that both plans share the same core service codes, specifically 37, 64, 65, and 71, when describing the work Fidelity performed for the two plans.

88.     Simply put, each of the above plans are comparable because the plans are of similar size in both participants and assets and, more importantly, because Fidelity is the recordkeeper for each and performed nearly identical services for each. Thus, based on the comparator plans, if the Plan were a standalone plan, with over 9,000 participants and over $850,000,000 dollars in assets in 2021, Cemex should have been able to negotiate a <u>total</u> recordkeeping fee of $25 per year, per participant, at most, from the beginning of the Class Period to the present.

89.     As demonstrated by these benchmarks, considering that the recordkeeping services provided by Fidelity in this case are similar to those provided by all national recordkeepers, like Fidelity, Cemex's decision to cause the Plan and its participants to pay at least $50 in direct compensation to Fidelity through 2021, is both imprudent and in violation of ERISA.

90.     And this, of course, is only the direct compensation Cemex admits to causing the Plan to pay Fidelity. In reality, based on the documents available to Plaintiff thus far, by adding the indirect compensation to the direct compensation paid to Fidelity, the true total compensation paid to Fidelity was approximately $175 per participant, per year. The Plan, due to its number of participants and assets, had the leverage to negotiate much better costs, but imprudently failed to do so.

91.     In fact, Fidelity itself provided evidence supporting Plaintiff's position on this discrete issue.  Fidelity's own retirement plan was recently sued.  In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

92.     Additionally, in the *Moitoso* case Fidelity went on to stipulate as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017, is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-record kept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).[3]

93.     The key takeaway from this stipulation by Fidelity, the same recordkeeper utilized in this case, is simple: Fidelity served as Cemex's Plan's recordkeeper during the same time period from the *Moitoso* case when Fidelity admitted: (a) its own plan did not offer services broader or more valuable than any of the plans it served and, more importantly, (b) the value of those services ranged from between $14.00 to $17.00 per participant annually. Thus, for Cemex to permit Fidelity to charge its Plan $50.00 per participant annually in direct compensation (or more) is both imprudent and a violation of its fiduciary duty. When coupled with the indirect compensation,

---

[3] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2.

Cemex permitted Fidelity to charge the Plan upwards of $175.00 per year for recordkeeping, or more.

94.     To be clear, even the $50.00 in direct compensation Cemex's documents prove that it caused the Plan to pay for recordkeeping and administrative services is, in fact, excessive for the specific services performed by Fidelity in this case, and as to this Plan.

95.     As explained above, the services codes from the Cemex 5500 describe both the kind of services provided and the type of compensation received via utilization of the codes 37, 60, 64, 65, and 71. Those codes translate as follows: participant loan processing (service code "37"); sub-transfer agency (service code "60"); recordkeeping (service code "64"); account maintenance (service code "65"); and, finally, securities brokerage commission and fees (service code "71"). These recordkeeping services provided by Fidelity in this case are similar to those provided by all national recordkeepers, including Fidelity, to similar mega-sized plans.

96.     Cemex could have and should have used the Plan's increasing size and long-standing relationship with Fidelity as bargaining power to reduce the Plan's costs. It failed to do so.

97.     Cemex allowed excessive compensation to be paid to Fidelity during the Class Period because when the Plan's assets grew, so did Fidelity's compensation even though its duties, services, and costs did not grow in proportion.

98.     In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Cemex could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by Fidelity at a lower cost – likely by

Fidelity itself – had Cemex acted as a prudent fiduciary would have under the circumstances. But Cemex failed to do so and, as a result, violated its fiduciary duties under ERISA.

### FIRST CLAIM FOR RELIEF
### *Breach of Fiduciary Duty of Prudence*

99.     Plaintiff re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

100.     As a fiduciary of the Plan, Cemex was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

101.     Cemex breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Cemex failed to monitor or control the excessive compensation paid to Fidelity.

102.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Cemex complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

103.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Cemex is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiff are entitled to equitable relief and other appropriate relief for Cemex's breaches as set forth in their Prayer for Relief.

### PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all Plan participants, respectfully

request that the Court:

1.      Find and declare that Cemex breached its fiduciary duties as described above;

2.       Find and adjudge that Cemex is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Cemex to provide all accountings necessary to determine the amounts Cemex must make good to the Plan under §1109(a);

5.      Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Cemex and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiff as class representatives, and appoint the undersigned as Class Counsel;

9.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.      Order the payment of interest to the extent it is allowed by law; and

11.      Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 12 day of January, 2023.

Respectfully submitted,

By: /s/Paul M. Botros
**MORGAN & MORGAN, P.A.**
Paul M. Botros, Esq.
Tex. Bar. No.:  24040548
pbotros@forthepeople.com
8151 Peters Road, Suite 4000
Plantation, FL 33324
Tel: (954) 318-0268
Fax: (954) 327-3017

**BRANDON J. HILL**
(*pro hac vice application forthcoming*)
Florida Bar Number: 37061
**LUIS A. CABASSA** (*pro hac vice application forthcoming*)
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
(*pro hac vice application forthcoming*)
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992
Facsimile: (813) 229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**MARC R. EDELMAN**
(*pro hac vice application forthcoming*)
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone: 813-577-4722
Fax: 813-257-0572
Email: MEdelman@forthepeople.com

**MICHAEL C. MCKAY**
((*pro hac vice  application forthcoming*)
**MCKAY LAW, LLC**
Arizona Bar No. 023354
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250

Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

*Attorneys for Plaintiff and the Class*