Case 4:23-cv-00117   Document 68   Filed on 08/08/25 in TXSD   Page 1 of 11

United States District Court
Southern District of Texas
**ENTERED**
August 08, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES CINA, | § | |
| Plaintiff. | § § § | |
| V. | § § | CIVIL ACTION NO. 4:23-cv-00117 |
| CEMEX, INC., | § § § | |
| Defendant. | § | |

## OPINION AND ORDER

Plaintiff James Cina is a former employee of Defendant Cemex, Inc. and a current participant in the Cemex, Inc. Savings Plan (the "Plan"). Cina brings this purported class action on behalf of more than 9,000 Cemex employees who were Plan participants at any time between January 3, 2017, and the present. In short, Cina alleges that Cemex, a statutory fiduciary to the Plan, breached its fiduciary duties in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. §§ 1001–1461. Cina asks the court "to restore to the Plan all losses resulting from Cemex's breaches of fiduciary duty." Dkt. 1 at 1.

Cemex has moved to dismiss the case, arguing that Cina's breach of fiduciary duty claim is "based on nothing more than conclusory or unsupported statements." Dkt. 30 at 6. For the reasons that follow, I deny Cemex's Motion to Dismiss.[1]

## BACKGROUND[2]

Cina worked for Cemex from 2005 through March 2022. He is a Plan participant. The Plan is a defined contribution 401(k) retirement plan established and maintained under written documents in accordance with ERISA. The Plan

---

[1] I apologize profusely for the delay in issuing this opinion. This case fell through the cracks. I accept full responsibility. No excuses. The parties unquestionably should have received this opinion a long time ago.

[2] This section summarizes the allegations raised in the Class Action Complaint. Dkt. 1.

provides the primary source of retirement income for many of Cemex's current and former employees. "As of December 31, 2021, the Plan had $877,803,260 in assets and 9,269 participants with account balances." Dkt. 1 at 4.

Fidelity Investments Institutional is the Plan's recordkeeper and has fulfilled that role since 2012. A recordkeeper provides administrative services to retirement plans. These services include tracking each participant's investments in the Plan, providing account statements, and offering investment education materials and advice. The tasks Fidelity performs as the Plan's recordkeeper consist of "validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management, including computing, tabulating, and data processing." *Id.* at 19.

Plan participants are assessed fees to pay for recordkeeping services. Fidelity receives two types of fees: direct fees and indirect fees. Direct fees are paid directly from Plan assets, typically in the form of a flat annual fee charged on a per participant basis. Indirect fees are paid "by taking money from plan participants' individual accounts." *Id.* at 8.

Cina alleges "that the recordkeeper fees the Plan participants are paying are excessive and that Cemex should have done more to investigate, monitor, request, negotiate, and secure reasonable fees for the Plan." *Id.* at 10. As for the direct fees, Cina asserts that defined benefit plans of similar size pay "$25 or less, per participant, annually." *Id.* at 21. By contrast, Fidelity charges much more. The Plan's annual fee disclosure dated December 12, 2022, states that Fidelity receives a recordkeeping fee of "$50 per year." Dkt. 1-1 at 4. The Plan's Form 5500—an annual report that contains information about a company's benefit plans—suggests that the direct fees are even higher than that reported in the annual fee disclosure. *See* Dkt. 1 at 16–17 (showing that Fidelity received between $57.88 to $93.78 per participant annually in the years 2018–2021). For 2021, the Plan's Form 5500 indicates that Fidelity received $947,098 in direct compensation with 9,269 participants. That equates to $57.97 per participant annually. Cina

2

maintains that whether the actual annual direct fee is $50 or $57.97 is irrelevant, because Fidelity is charging at least double the amount it should be charging Plan participants.

To support its allegation that the direct fees charged by Fidelity are excessive, Cina points to four other retirement plans for which Fidelity acts as the recordkeeper. *See id.* at 19–23. A chart detailing the number of participants, value of assets, and services provided by those four benefit plans indicates that the Plan paid Fidelity significantly more in direct fees than the other retirement plans paid Fidelity. *See id.* at 20. Cina also makes much of the fact that Fidelity recently admitted in a federal lawsuit in Massachusetts that the value of its recordkeeping services for a retirement plan "would range from $14-$21 per person per year." *Id.* at 24 (quoting *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 214 (D. Mass. 2020)).

With respect to indirect expenses, Fidelity receives compensation in two ways. First, Fidelity receives fees via "float" on Plan participant money. Cemex has agreed that whenever Plan participants deposit or withdraw money from their individual accounts in the Plan, the money will first pass through a Fidelity clearing account. Cemex has also agreed that Fidelity can "keep the investment returns and/or any interest earned on Plan participant money while the money is in Fidelity's clearing account." Dkt. 1 at 10. Because Plan participant money typically sits in Fidelity's clearing account for 2–3 days and hundreds of millions of dollars are transferred in and out of the Plan every year, Cina suggests that Fidelity earned millions of dollars in float compensation alone. Second, Fidelity receives indirect compensation by revenue sharing. In a revenue sharing arrangement, Fidelity receives fees based on the amount of assets in the Plan, or the amount of assets in certain investments in the Plan. Cina does not identify a specific amount of fees Fidelity obtains by use of revenue sharing.

Cina recognizes that it is not *per se* imprudent for recordkeepers like Fidelity to collect indirect fees. At the same time, Cina emphasizes that a fiduciary must implement three relevant processes to prudently manage and control a benefit

3

plan's recordkeeping costs. First, fiduciaries must closely monitor the recordkeeping fees being paid by the Plan. Second, a fiduciary must identify all compensation, including direct fees and indirect fees, paid to a recordkeeper to ensure that the recordkeeper is not paid an unreasonable fee for providing the Plan services. Third, a plan's fiduciary must remain informed about overall trends in the marketplace concerning the fees paid by other similarly situated plans and conduct a request for proposal ("RFP") every few years or more frequently, based on the individual circumstances of a given plan.

Cina insists that Cemex has breached its fiduciary duties by failing "to monitor or control the excessive compensation paid to Fidelity"—both through direct and indirect fees. *Id.* at 26. Specifically, Cina alleges that Cemex failed to conduct RFPs at reasonable intervals, resulting in the Plan overpaying for recordkeeping expenses. Cemex has also "not tracked, monitored, nor negotiated the amount of compensation Fidelity receives from the return it earns on Plan participant money while the money is in Fidelity's clearing account." *Id.* at 11.

### LEGAL STANDARD

A defendant may move to dismiss a complaint when a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Conversely, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point

of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (citation modified).

When evaluating a Rule 12(b)(6) motion, I must accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 948 F.3d 673, 675 (5th Cir. 2020) (quotation omitted). I "do not, however, accept as true legal conclusions, conclusory statements, or naked assertions devoid of further factual enhancement." *Benfield v. Magee*, 945 F.3d 333, 336–37 (5th Cir. 2019) (citation modified). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. That said, "[a] motion to dismiss under [R]ule 12(b)(6) is viewed with disfavor and is rarely granted." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (quotation omitted).

## ANALYSIS

A motion to dismiss in the ERISA context is an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). District courts are instructed to undertake "careful, context-sensitive scrutiny of a complaint's allegations" to "divide the plausible sheep from the meritless goats." *Id.*

Under ERISA, a plan fiduciary is required to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). A fiduciary of an employee benefit plan must also "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." *Id.* § 1104(a)(1)(A)(i)–(ii).

"[T]o allege a breach of fiduciary duty under ERISA, [Cina] must show that: (1) the Plan is governed by ERISA;" (2) Cemex was a fiduciary of the Plan; and (3) Cemex "breached [its] duties of prudence and/or loyalty under ERISA, resulting in losses to the participants of the Plan." *Blackmon v. Zachary Holdings, Inc.*, No. 5:20-cv-988, 2021 WL 2190907, at *3 (W.D. Tex. Apr. 22, 2021). Here, the first two prongs are not in dispute—the parties agree that the Plan is governed by ERISA and that Cemex is a fiduciary of the Plan. To resolve the pending motion to dismiss, I must therefore determine whether Cina has alleged the third element: a breach of the duty of prudence by Cemex.

"At the pleadings stage, [Cina is] required to plausibly allege that [Cemex's] failure to obtain comparable recordkeeping services at a substantially lesser rate was outside the range of reasonable actions that [Cemex] could take as plan fiduciary." *Perkins v. United Surgical Partners Int'l, Inc.*, No. 23-10375, 2024 WL 1574342, at *4 (5th Cir. Apr. 11, 2024) (quotation omitted). For Cina's breach of fiduciary claim to survive dismissal, Cina "must have pleaded sufficient facts to render it plausible that [Cemex] incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees." *Id.* (quotation omitted).

Cina claims that Cemex breached its duty to prudently administer the Plan and defray reasonable costs of administering the Plan by causing the Plan to pay unreasonable and excessive record keeping costs. Cina further avers that Cemex failed to prudently exercise its fiduciary duty to monitor and limit those expenses. Faced with these allegations, Cemex counters that I should dismiss the fiduciary duty claim based on allegedly inflated recordkeeping fees because Cina has failed to allege "a sound basis for comparison—a meaningful benchmark." Dkt. 30 at 11 (quotation omitted). Without a meaningful benchmark, Cemex argues, Cina cannot create a reasonable inference that Cemex has breached a fiduciary duty.

6

Although a number of appellate courts have adopted a "meaningful benchmark" standard in ERISA fiduciary duty cases,[3] the Fifth Circuit has yet to adopt such a standard. Within the Fifth Circuit, district courts are split on the issue. *See, e.g.*, *Locascio v. Fluor Corp.*, No. 3:22-cv-0154, 2023 WL 320000, at *6 (N.D. Tex. Jan. 18, 2023) (holding that "meaningful benchmarks for comparison are important . . . to show that a prudent fiduciary in like circumstances would have acted differently"); *Seidner v. Kimberly-Clark Corp.*, No. 3:21-cv-867, 2023 WL 2728714, at *6 (N.D. Tex. Mar. 30, 2023) ("[T]he court is not persuaded that application of the 'meaningful benchmark' standard advocated by Defendants is appropriate."); *Blackmon*, 2021 WL 2190907, at *5 (holding "that the determination of the appropriate benchmark for a fund is not properly resolved at the motion to dismiss stage"). I need not address the appropriateness of applying a meaningful benchmark standard at the pleading stage. Even if I assume that such a standard is properly applied when deciding a Rule 12(b)(6) motion, Cina has done enough (by a hair) to fend off the motion to dismiss.

Under the meaningful benchmark standard, "the key to stating a plausible excessive-fees claim is to make a like-for-like comparison." *Matousek*, 51 F.4th at 279. Cina compares the Plan to four other retirement plans for which Fidelity served as the recordkeeper. Those plans are the Bertelsmann 401(k) Savings Plan, the Mohawk Industries Retirement Plan 2, the Driv 401(k) Retirement Savings Plan, and the Veolia North America 401(k) Savings Plan. *See* Dkt. 1 at 20. For 2021, Cina points out that participants in the Bertelsmann Plan paid $4.74 annually in direct fees; participants in the Driv Plan paid $8.79 annually in direct fees; participants in the Mohawk Plan paid $19.73 annually in direct fees; and participants in the Veolia Plan paid $23.36 annually in direct fees. *See id.* Because these fees are much less than the $57.97 annual fee that Fidelity charged Plan

---

[3] *See, e.g.*, *Singh v. Deloitte LLP*, 123 F.4th 88, 96 (2d Cir. 2024); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1148 (10th Cir. 2023); *Matousek v. MidAm. Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 581–82 (7th Cir. 2022); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022).

participants here (at least according to the Form 5500), Cina argues that its pleading easily crosses the plausibility line.

I agree with Cemex that two of these comparator plans—the Bertelsmann Plan and the Mohawk Plan are improper comparators. The Bertelsmann Plan has more than double the assets of Cemex's Plan ($1.841 billion v. $877 million), with approximately 37 percent more plan participants (12,678 v. 9,269). This is important because, as Cina recognizes, "[p]lans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee." Dkt. 1 at 8. The Mohawk Plan also does not qualify as a comparator because the services Fidelity provided to the Mohawk Plan are not the same as the services provided to Cemex's Plan. It is common sense that a plan that provides fewer services would charge lower fees, and Cina has not alleged why this would not be so. *See Miller v. Packaging Corp. of Am.*, No. 1:22-cv-271, 2023 WL 2705818, at *6 (W.D. Mich. Mar. 30, 2023) ("Because of the variation in services provided by the different recordkeepers, it is difficult to make a fair comparison between" the fees charged.).

The remaining two comparators—the Driv Plan and the Veolia Plan—have similar assets as Cemex's Plan (Driv Plan: $935 million; Veolia Plan: $962 million; the Plan: $877 million) and a comparable number of plan participants (Driv Plan: 10,170; Veolia Pla: 8,030; the Plan: 9,269). Fidelity also provides the same services to Cemex's Plan that it provides to the Driv Plan and the Veolia Plan. Based on the allegations set forth in the live pleading, it appears as if the Driv Plan and the Veolia Plan provide a like-for-like comparison supporting Cina's allegation that "Cemex caused its Plan to pay Fidelity excessive [direct] fees for the same services that Fidelity offered comparator plans for much less." Dkt. 1 at 20.[4] The allegations as

---

[4] Cemex argues that the Driv Plan and the Veolia Plan are improper comparators because Fidelity received more indirect fees from those plans than it receives from Cemex's Plan. *See* Dkt. 30 at 21–22 (noting that Cemex's Plan has two sources of indirect compensation while Veolia has 42 sources and Driv has 32 sources). Cemex argues that because these plans do not disclose the amount of indirect compensation paid to Fidelity, it is impossible

8

to the Driv Plan and the Veolia Plan are more robust than in other cases where district courts granted motions to dismiss breach of fiduciary duty claims for failure to provide meaningful benchmarks. *See, e.g.*, *Locascio*, 2023 WL 320000, at *6 ("The crux of Summers's pleading issue lies in the fact that simply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks against which to compare the performance of the allegedly imprudent funds." (quotation omitted)). To be clear, I am not holding that the Driv Plan and the Veolia Plan are, as a matter of law, comparable to Cemex's Plan. I am simply noting that Cina has made sufficient allegations to proceed with discovery. Factual disputes are better resolved as the case moves forward with the benefit of discovery. *See, e.g.*, *Huang v. TriNet HR III, Inc.*, No. 8:20-cv-2293, 2022 WL 93571, at *9 (M.D. Fla. Jan. 10, 2022) (Disputes concerning the proper amount of recordkeeping fees "raise factual questions that are not appropriate for this Court to resolve at the motion to dismiss stage."); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018) ("The question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss.").

Cemex hangs its hat on the fact that Cina does not allege the specific amount of indirect fees Fidelity received for its recordkeeping services. To Cemex, this is a fatal flaw that mandates dismissal. *See* Dkt. 30 at 16 ("Where a recordkeeper charges both direct and indirect compensation, the reasonableness of the fees can be determined only by looking at the total fees charged."). I am not persuaded. Because Cemex acknowledges that it has not disclosed the amount of or the formula by which it calculates Fidelity's indirect compensation, it is impossible, at this juncture, for Cina to provide those figures. Because ERISA plaintiffs like Cina

---

to discern the total compensation that Fidelity receives from these plans. It is the total compensation, Cemex argues, that should be assessed when determining whether a plan charges excessive recordkeeping fees. I discuss this issue below.

generally do not have "inside information" regarding the fiduciary's process, "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (quotation omitted).

Viewing the Class Action Complaint as a whole, Cina has painted a picture that supports a plausible inference that Cemex imprudently allowed the Plan to pay an unreasonable amount in recordkeeping fees to Fidelity. Cina alleges that retirement plans of similar size pay no more than $25 annually per participant in direct fees. To support this allegation, Cina points to two other retirement plans with roughly the same number of participants and comparable assets who paid significantly less in direct fees for similar recordkeeping services than the Plan. As a reminder, participants in the Driv Plan paid $8.79 annually in direct fees and participants in the Veolia Plan paid $23.36 annually in direct fees. *See* Dkt. 1 at 20. Regardless of whether Fidelity charges the Plan $50 or $57.97 per participant annually for direct fees, the figure is significantly higher than what Cina maintains is a reasonable rate for a retirement plan of similar size. Moreover, Cina notes that Fidelity has stipulated in other litigation "that if Fidelity were a third party negotiating this fee structure at arms-length," recordkeeping "services would range from $14-$21 per person per year." *Id.* at 24 (quoting *Moitoso*, 451 F. Supp. 3d at 214). Focusing on the indirect fees charged by Fidelity to the Plan, Cina contends that Cemex has failed to conduct RFPs as a reasonable prudent fiduciary should and improperly allowed Fidelity to rake in millions of dollars in fees via float and revenue sharing without proper monitoring and oversight.

Cemex attacks each of these allegations, arguing that Cina's claims should be disregarded because they are conclusory, misleading, and plagued with inaccuracies. Fair point. Still, taken as a whole, these allegations plausibly allege an ERISA breach of fiduciary duty claim as to excessive recordkeeping costs. I do not know if these allegations are true. I am certainly not prejudging this case. But Cina has alleged, in the words of the Fifth Circuit, "sufficient facts to render it

plausible that [Cemex] incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees." *Perkins*, 2024 WL 1574342, at *4 (quotation omitted). "The parties should engage in discovery to resolve these fact-intensive questions." *Lopez v. Embry-Riddle Aeronautical Univ., Inc.*, No. 6:22-cv-1580, 2023 WL 7129858, at *10 (M.D. Fla. July 12, 2023) (denying motion to dismiss breach of fiduciary duty recordkeeping claim based on similar allegations); *see also Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015) ("While Defendants claim that Plaintiffs have not alleged facts regarding why the amount of the recordkeeping fees are excessive, the services provided, or how the fees charged to the Plan were excessive in light of those services, this court finds that those are the types of facts warranting discovery, and, therefore, dismissal at this stage is not appropriate.").

## CONCLUSION

For the foregoing reasons, I deny Cemex's Motion to Dismiss. Cina's pending motion to strike (Dkt. 57) and motion for ruling (Dkt. 66) are denied as moot. Cina's motion to lift stay (Dkt. 58) is granted. A status conference is set for Thursday, August 14, 2025, at 2 pm by Zoom to discuss a Docket Control Order to govern the future proceedings in this case. My case manager will provide a Zoom link to the parties. Before that status conference, the parties are ordered to confer to discuss proposed dates for a Docket Control Order.

SIGNED this 8th day of August 2025.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE